UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID JANKOWSKI,<br><br>    Defendant,<br><br>STEPHEN, PAULA, ALEX, and JENNA JANKOWSKI,<br><br>    Interested Parties. | Case No. 24-50222<br>Honorable Laurie J. Michelson |

**ORDER GRANTING IN PART PETITIONERS' EMERGENCY MOTION FOR RELEASE OF FUNDS HELD IN ESCROW FROM SALE OF MAPLE GARDEN APARTMENTS [6]**

Less than one month after filing this miscellaneous action seeking to protect certain assets from being used to satisfy David Jankowski's criminal restitution obligations, Petitioners Stephen, Alex, Jenna, and Paula Jankowski filed an emergency motion to release from escrow the proceeds from the sale of the Maple Garden Apartments. Petitioners claimed that, as members of Maple Garden Associates, LLC, they were entitled to their share of the proceeds from the sale of the property. The government disagreed. It argued that Petitioners were really just nominees of the now convicted David Jankowski, such that the government is entitled to all the proceeds.

Following a limited evidentiary hearing, the Court found that Paula, Alex, and Jenna were nominees of David Jankowski such that the government was entitled to their share of the Maple Garden proceeds. The Court, however, needed further time to address whether Stephen Jankowski, the property manager of the Maple Garden Apartments, was also a nominee. Following additional briefing and a second hearing regarding Stephen's involvement in MGA, LLC, the Court now finds that Stephen is not a mere nominee of David Jankowski. Thus, the Court will GRANT the motion to release Stephen Jankowski's portion of the funds.

## I.

Following a jury trial, David Jankowski was convicted on July 11, 2022, of unlawful distribution of controlled substances, health care fraud, and conspiracy to commit the two offenses. He was sentenced to 240 months' imprisonment and ordered to pay $5.2 million in restitution to Medicare. *See United States v. Jankowski*, No. 17-20401, (E.D. Mich. May 18, 2023), ECF No. 253. A final order of forfeiture was also entered in the amount of $35 million. *Jankowski*, No. 17-20401, ECF No. 238. The Sixth Circuit affirmed David's conviction and sentence, including the forfeiture order. *United States v. Jankowski*, No. 23-1404, 2024 U.S. App. LEXIS 26960 (6th Cir. Oct. 23, 2024). Numerous lawsuits have arisen in connection with the government's collection efforts to satisfy these monetary penalties. This is one of them. David's wife and children initiated this miscellaneous case by filing a Motion to Release and/or Narrow Government Liens on Real Property Subject to the Restitution Order. (ECF No. 1.) The Jankowski family members claimed to have membership interests in

limited liability companies that own certain properties, and sought to prevent the government from encumbering their individual interests to satisfy David's restitution obligation.

While their initial motion was pending, Petitioners filed a separate emergency motion to have their purported shares of the proceeds from the sale of Maple Garden Apartments—one of the properties at issue—immediately released from escrow. (ECF No. 6.) Petitioners argued that since the filing of the initiating motion, "an urgent issue arose, namely, that capital gains taxes owed by the members of Maple Gardens Association, LLC, namely, Third Parties, Paula, Stephen, Alex and Jenna Jankowski are due." (*Id.* at PageID.51.) And, they continued, "[w]ithout the release of the funds held by the government, the Third Parties are unable to pay their taxes due to the Internal Revenue Service ('IRS') and State of Michigan on April 15, 2024. If the taxes are not paid, additional penalties (as high as 25 percent of the taxes owed) and interest will start accruing." (*Id.*)

The presiding judge at the time ordered the parties to submit supplemental briefing on the issue of distribution of the Maple Garden funds. (ECF Nos. 8, 9, 11.) In deciding whether to release the funds to Petitioners, the Court needed to first determine whether they had a legitimate interest in the funds. The government took the position that MGA, LLC was a corporate entity wholly owned and controlled by David, who utilized the Petitioners as straw holders of membership interests to shield his assets. Accordingly, the parties' briefing focused on the central inquiry of whether

David remained the true owner of all of MGA, LLC such that Petitioners were simply his nominees and thus not entitled to a share of the proceeds. (*See* ECF Nos. 9, 11.)

Prior to any ruling on the emergency motion, the case was reassigned. (ECF Nos. 19, 20.) This Court quickly reviewed the briefing and found that it needed additional information about Stephen Jankowski's individual interest. Thus, the Court scheduled the emergency motion for hearing on December 20, 2024, and directed that Stephen Jankowski be present to provide additional testimony about the acquisition of his 25 percent interest in MGA, LLC. (ECF No. 24.)

The Court also asked the parties to clarify the applicable legal standards and burdens of proof. The parties agreed that Petitioners had the initial burden to show that they had a legal interest in the proceeds, and then the burden shifted to the government to demonstrate, by a preponderance of evidence, that those interests were not legitimate. (ECF No. 33, PageID.718–719.)

### A. The First Evidentiary Hearing

During the December 20, 2024, proceeding, Stephen testified that he started managing the Maple Garden Apartments around 2015, when his brother, the previous property manager, suffered health complications. Thereafter, on January 11, 2016, Stephen formally received his 25 percent interest in the LLC. Stephen also testified that he believed he was given his interest in the LLC because he had taken over as the property manager. As for whether his father gave him his interest as a "gift" or as compensation for managing the property, Stephen was less clear:

> Q. In another part of the dep you suggested the 25 percent interest may have been a gift from your father, you recall that?

4

A. That is correct.

Q. Do you know?

A. Do I know what?

Q. Do you know whether it was a gift to manage the property or are you speculating? I mean, do you know one way or the other?

A. I've signed a document stating I was a 25 percent owner and, you know, he was my father and he said, "Manage the property." So, that's what I did.

. . .

Q: And when you said, though, that it might have been a gift, why did you think that?

A. For me managing property.

Q. Why would that be a gift?

A. I guess I'm confused.

Q. When I read your dep, there w[as] some testimony that the consideration that you gave for getting this 25 percent interest was managing the property?

A. That's correct.

Q. And then in another part of the dep you suggested that you getting the 25 percent interest may have been a gift from your dad?

A. That's correct.

Q. And do you think those two things are the same?

A. I'm not sure.

Q. And that's what I'm trying to get at. Do you know whether the reason you got a 25 percent interest in MGA was because your dad was giving you a gift or as some sort of compensation for managing the property?

A. I guess both.

5

(ECF No. 33, PageID.727–728, 730–731.) Consistent with his surmise that at least some portion of his membership interest was to compensate him for his work for the LLC, Stephen testified that his only other income or compensation for this work was a $500/month car payment allowance.

The LLC's main function, Stephen explained, was to own and operate the Maple Garden Apartments. And as the property manager, Stephen's main role was to deal with the day-to-day operations of the seventeen units in those buildings. This included keeping the property in good condition to attract and retain renters and justify rent increases. It was Stephen who set the rental price per unit, advertised the empty units on Zillow, and showed them to prospective tenants. (*Id.* at PageID.733.) Likewise, Stephen oversaw collecting rent from the tenants and upkeeping the units. He testified that "[a]ny time anyone needed anything, they would call [him]" and he would "have someone go and fix it." (*Id.* at PageID.733–734.) Similarly, Stephen was in charge of hiring contractors and landscapers to work on different projects at the apartment complex. (*Id.* at PageID.748.)

From 2015—when he first started managing the property—to 2023—when the property was sold—Stephen was at the property often. He testified that in the first couple of years he was there "pretty much every day of the week." (*Id.* at PageID.734.) From 2015 to 2023, Stephen spent anywhere from 30 to 60 hours a week at the property. (*Id.* at PageID.737–738.) And in 2023, it was Stephen who helped facilitate the sale of the property. (*See* ECF No. 9-5, PageID.189.) But, Stephen clarified,

6

working at MGA was not his only job. From 2015–2023 he also worked as a sales representative for two different medical companies. (ECF No. 33, PageID.735–737.)

At the conclusion of the hearing, the Court ruled orally that Paula, Alex, and Jenna Jankowski were nominees of David Jankowski such that they did not have a legal interest in the proceeds from the sale of the Maple Garden Apartments and denied their request for the immediate release of proceeds held in escrow. (ECF No. 33, PageID.776; see ECF No. 29.) The Court took Stephen's interest under advisement.

### B. The Second Evidentiary Hearing

While Stephen's interest remained pending, the government filed a notice to correct the record. (ECF No. 40.) The government explained that the hearing was the first they learned that MGA, LLC had a bank account at Sterling Bank and Trust. So, after the hearing, the government served a subpoena on Sterling and received a number of checks totaling about $67,000 in payments from MGA, LLC to Stephen. (ECF Nos. 40, 44.) The government further advised that, in a related collection matter, they received a filing from David Jankowski stating that his transfer of LLC membership interests to his family members were "gifts" and in recognition of "years of uncompensated work." (ECF No. 44, PageID.866.)

The checks written to Stephen, however, did not indicate what the payments were for. Thus, the Court had no way to discern if the payments were salary, reimbursements for work Stephen did on the properties, or something else. So the Court scheduled another hearing for May 19, 2025, where it again heard testimony

7

from Stephen regarding his ownership interest in the LLC. More specifically, the Court was interested in why Stephen received $67,000 from the LLC from June 2017 to October 2022, as this could affect the legitimacy of the membership interest Stephen received from David.

At that hearing, Stephen testified that the checks were primarily reimbursements for supplies he personally purchased from stores like Lowes and Home Depot to renovate the apartments. He explained that the LLC did not have a credit card and that paying for supplies via check in-store was inconvenient. So it was easier, Stephen said, to pay for the supplies with his personal funds and seek reimbursement later.

At least three of the checks Stephen received, however, were personal loans for investments he made in different properties. These included: a June 3, 2019, check for $7,600, an April 1, 2020, check for $20,000, and an April 9, 2022, check for $25,000. (ECF No. 40, PageID.849–851.) Stephen did not pay these loans back.

## II.

The issue now before the Court is whether, with respect to his interest in MGA, LLC, Stephen Jankowski is a nominee of David Jankowski such that the government may seize Stephen's share of the MGA sale proceeds to satisfy David's criminal restitution judgment.

Generally, state law determines whether an individual has an existing property interest. *See, e.g.*, *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005).

But absent any clear state law on the issue of nominee interests the Court may look to other law for guidance. *Id.* at 253.

And, as the government has highlighted, "[t]here is no known Michigan law discussing nominee theory, so Michigan federal courts have adopted the federal *Porta-John* six factor test to determine whether property is held by a nominee." (ECF No. 9, PageID.96); *see United States v. DeTar*, No. 04-749, 2009 U.S. Dist. LEXIS 65064, at *13–14 (W.D. Mich. July 28, 2009) (stating that "the Court is not aware of any Michigan case law discussing nominee theory," reasoning that "in the absence of clear state law on the issue, a court may look to other courts for guidance," and applying *Porta-John*); *Bennett v. United States*, No. 09-12352, 2010 U.S. Dist. LEXIS 130173, at *37 (E.D. Mich. Dec. 9, 2010) ("Although there appears to be no Michigan case law discussing nominee theory by that name, federal courts in Michigan have consider[ed]" *Porta-John's* six factors). Just as significant, the parties' briefing applied the *Porta-John* factors. (ECF Nos. 9, 11.)

In *Porta-John*, the Court held that:

> In order to establish that property is held by a nominee, the Court must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

4 F. Supp. 2d 688, 701 (E.D. Mich. 1998). On the record before the Court, some *Porta-John* factors weigh in Stephen's favor, some weigh against him, and some are neutral.

9

To start, the first factor—whether Stephen paid adequate consideration for his interest in the LLC—weighs in Stephen's favor. The Court finds that Stephen's uncompensated work as the MGA property manager serves as adequate consideration for his 25 percent interest in MGA, LLC. Stephen testified about his substantial duties, responsibilities, and obligations geared toward maintaining and increasing the value of the LLC's sole asset that warrants more than the $500/month car allowance he received. And the majority of checks Stephen received from the LLC were not salary but reimbursements. While his testimony was not entirely clear, Stephen did state that he believed his father transferred this interest to him at least, in part, to compensate him for his property manager work. True, Stephen received additional compensation from the LLC in the form of $52,600 in unpaid loans. But this does not suggest that Stephen's labor was inadequate consideration for a 25 percent membership interest. *See, e.g., United States v. Wilson*, No. 14-13831, 2016 U.S. Dist. LEXIS 73083, at *56–57 (E.D. Mich. June 6, 2016) (finding inadequate consideration when property was transferred for no consideration via a quitclaim deed); *SEC v. Mulholland*, No. 12-14663, 2017 U.S. Dist. LEXIS 190387, at *43 (E.D. Mich. Nov. 17, 2017) (finding "grossly inadequate consideration" when property was transferred for ten dollars). So the first factor weighs in Stephen's favor.

Likewise, the fourth factor—whether the transfer was recorded—also weighs in Stephen's favor. Here, the transfer from David to Stephen was formally recorded. A certificate of resolution shows that on January 11, 2016, MGA, LLC passed a resolution granting a 25 percent membership interest to Stephen Jankowski.

10

Further, Stephen's 2016 K-1 is consistent with him receiving an ownership interest in the LLC that year. (ECF No. 9-15, PageID.268.) And in 2019, Stephen became the resident agent for the LLC. (ECF No. 11-1, PageID.511–512.)

But the third factor—whether there is a close relationship between David and Stephen—weighs against Stephen. Indeed, David and Stephen are father and son. And the transferring of assets within such a close, familial relationship is viewed with suspicion. *See Brydges v. Emmendorfer,* 18 N.W.2d 822, 824 (Mich. 1945) ("As a general rule transactions between members of a family must be closely scrutinized when the rights of creditors are involved and when such transactions are accompanied by other badges of fraud.") (quoting *Farrell v. Paulus,* 15 N.W.2d 700, 704 (Mich. 1944)); *Kelly v. Thomas Solvent Co.*, 722 F. Supp. 1492, 1499 (W.D. Mich. 1989).[1]

Some of the factors are more neutral. This includes the second factor—whether David transferred his interest in the LLC to Stephen in anticipation of a lawsuit. As the government argues, "[David] Jankowski transferred the membership interests amidst his colleagues' criminal issues, and only 18 months before his own indictment." (ECF No. 9, PageID.99.) For example, on December 5, 2013, the indictment of Jankowski's colleague Dr. Elhorr was unsealed, detailing Elhorr's

---

[1] "Though Michigan courts do not discuss nominee theory by that name," it is worth noting that the *Porta-John* factors "are virtually identical to 'badges of fraud' that are often used by Michigan courts to determine whether property has been fraudulently conveyed to a third party." *DeTar*, 2009 U.S. Dist. LEXIS 65064, at *15 n.4. *Compare Porta-John*, 4 F. Supp. 2d at 701, *with Coleman-Nichols v. Tixon Corp.*, 513 N.W.2d 441, 449 (Mich. Ct. App. 1994). Thus, the Court finds that these cases evaluating familial ties in a "badges of fraud" analysis to be pertinent here.

11

participation in a scheme (similar to Jankowski's) which involved two of David's employees, Kelly White and Hassan Hamdan. (*Id.* at PageID.87.) Likewise, in 2015, "Dr. Laran Lerner, a business associate of Dr. Jankowski's, was also convicted for health care fraud." (*Id.*) Significantly, Dr. Lerner co-owned Dearborn Real Estate Associates, LLC with David. (*Id.*) So, the government says, David likely knew he was going to be indicted, and thus started to offload his assets to his family in an attempt to shield those assets from the government.

But this evidence could possibly be interpreted another way. Because others were being indicted while David was not, he could have thought he had escaped prosecution. Stephen did not believe that his father altered his behavior or how he conducted business during this time. And looking at this particular LLC alone, there is an open question as to why David would have transferred some, but not all, of his interest if he knew he was at risk of being indicted. So this factor does not strongly favor either party.

That leaves the fifth and sixth factors—that is, whether David maintained control over the LLC despite offloading most of his interest in the entity and whether David continued to enjoy the benefits of the LLC, even after the transfer.

Courts have found that these factors are pivotal to the analysis—indeed, the most significant question to consider in determining nominee status is who really controls the asset at issue. *See, e.g.*, *DeTar*, 2009 U.S. Dist. LEXIS 65064, at *13 ("Generally, nominee status is determined by the degree of control that a party exerts over the nominee and the subject property."). The goal of nominee theory is "to discern

12

whether [an individual] has engaged in a sort of legal fiction . . . by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *Sumpter v. United States*, 302 F. Supp. 2d 707, 721 (E.D. Mich. 2004) (citing *In re Richards*, 231 B.R. 571, 578 (E.D. Pa. 1999); *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) ("The ultimate inquiry is whether the [individual] has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.")

The government urges the Court to find that David Jankowski continued to enjoy the benefits of the LLC and its property because he was the only member who received any significant distributions. (*See* ECF No. 9, PageID.100; ECF No. 9-18, PageID.415–416.) It also notes that while Stephen may have had the authority to sign on behalf of the LLC, the vast majority of checks from the LLC's bank account were signed by David. Indeed at the second evidentiary hearing, the government represented that from 2017 to 2023, David signed 495 checks on behalf of the LLC, while Stephen signed only 48. The government also highlighted that Stephen only gained access to the LLC's bank account in 2018, despite receiving his membership interest back in 2016. And, the government pointed out, Stephen only began signing a significant number of checks after his father's bond was revoked in the underlying criminal case. *Jankowski*, No. 17-20401 (E.D. Mich. Nov. 15, 2022), ECF No. 207. This evidence, says the government, shows that despite giving Stephen and his other family members membership interests, David really retained control over the LLC.

13

Stephen disagrees. Or at least disagrees that his level of control does not justify his 25 percent interest. On the financial side of things Stephen argues that, regardless of how many checks he wrote, he had the authority to withdraw money from the LLC's account. And, of course, he did sign some checks on behalf of the LLC from 2018 to 2023. Stephen also provided the Court with a plausible explanation for why his father wrote him reimbursement checks from the LLC account—it was easier to pay cash or use a credit card at a retail store and then get reimbursed from the LLC later. And while most of the checks he received were signed by his father, Stephen did write some checks from the LLC account to himself. (May 23, 2025, Hrg., Ex. 2.)

Financial authority aside, Stephen also argues that he was the one who exercised control over the sole asset of the LLC—the apartment buildings. He testified that he was in charge of managing the apartments. That included, among other things, advertising and filling vacant units, setting the rental price and collecting tenants' rent, hiring contractors to renovate units, and, occasionally, purchasing hardware and materials to personally renovate the property himself. This level of involvement in managing the LLC's sole asset and increasing its value, says Stephen, is evidence that he was not engaged in a "legal fiction," but rather behaving like a 25 percent owner of the LLC would be expected to behave. *See Sumpter*, 302 F. Supp. at 721.

The Court agrees. After evaluating the relevant factors, the Court finds that the government has failed to show by a preponderance of the evidence that Stephen

14

is a nominee of David with respect to his 25 percent membership interest in MGA, LLC. This conclusion is bolstered by a comparison to Stephen's mother and siblings. For instance, there was little to no evidence that Paula, Alex, and Jenna paid any consideration for their shares in the LLC. And they had little to no involvement or control over the day-to-day operations of the LLC and its property. *See, e.g.*, *DeTar*, 2009 U.S. Dist. LEXIS 65064, at * 23–24 (finding that an individual controlled a property when he "oversaw maintenance of the [p]roperty and paid for maintenance expenses."). To be sure, while David still received significant distributions from the LLC and played a large role in controlling its finances, Stephen had a role too. Indeed, it is not surprising that David still received some benefits and maintained some control as he also remained a 25 percent owner. But that does not prove that it is more likely than not that the granting of Stephen's interest was fictious such that David never really transferred his interest at all. Thus, Stephen is entitled to his 25 percent share of the proceeds from the sale of the Maple Garden Apartments.

### III.

For the foregoing reasons, the Court will GRANT IN PART Petitioners' motion for the return of property held in escrow as to Stephen Jankowski (ECF No. 6).

There is, however, one remaining wrinkle. The $52,600 in personal loans that Stephen took from the LLC but did not repay. Had that money been repaid to the LLC, Stephen would only be entitled to his 25 percent share. Accordingly, the Court ORDERS that $39,450—that is, 75 percent of $52,600—be subtracted from the proceeds Stephen is entitled to.

15

The Court believes that the proceeds of the sale of the Maple Garden Apartments are currently being held in an interest-bearing escrow account. Stephen Jankowski is entitled to 25 percent of those proceeds, less $39,450. The government shall disburse the proceeds within 14-days from the entry of this order.

SO ORDERED.

Dated: June 4, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
